JOSEPHINE FIEDLER, Appellant, v. IOWA STATE TRAVELING MEN'S ASSOCIATION, Appellee.

INSURANCE: **Eyewitness to Discharge of Firearm.** A person is not an ''eyewitness'' to the discharge of a firearm when he is unable to testify to any observation immediately preceding the discharge, at the time of the discharge, or immediately following the discharge, but is confined solely to stating his observations of the *consequences* of the discharge. So held under a policy providing for reduced indemnity for the results of injuries flowing from the discharge of firearms when there were no eyewitnesses to the discharge except the insured himself.

*Appeal from Wapello District Court.*—Seneca Cornell, Judge.

OCTOBER 19, 1920.

REHEARING DENIED APRIL 6, 1921.

FREDERICK H. Fiedler became a member of the defendant association in October, 1910, and continued in good standing until his death, in October, 1917. The petition is in two counts, one demanding recovery of an indemnity of $5,000, and the other for $500. The difference arises from conditions contained in the by-laws. Section 2 of Article VI thereof provides that:

"Whenever a member in good standing shall through external, violent and accidental means receive bodily injuries which shall independent of all other causes result in death within ninety days from the date of the receipt of said injuries, the beneficiary named in his application * * * shall be paid the sum of five thousand dollars."

Section 6 of the same article declares that:

" (1) The association shall not be liable in any manner to any member or beneficiary for any indemnity or benefit for death, disability or loss resulting wholly or partially, directly or indirectly from * * * injuries inflicted by the insured upon himself, while sane or insane, whether resulting fatally or otherwise. Each of the foregoing conditions, causes or acts are exempted from all the provisions of these by-laws granting to members or beneficiaries thereof benefits or indemnity; (2) the association shall not be liable under the provisions of Sections 1, 2 and 3, of this article in excess of one tenth of the amounts therein provided for benefits or indemnity, for injuries or the results therefrom under any of the following circumstances, to wit, injuries resulting from the discharge of firearms where there is no eyewitness to the discharge except the member himself; (3) the association shall not be liable under provisions of Sections 1, 2 and 3 of this article in excess of one tenth of the amount therein provided for, benefits or indemnity, for injuries or the results therefrom under any of the following circumstances, to wit: injuries intentionally inflicted upon the insured by another person, injuries received while violating the law,

injuries resulting from the discharge of firearms where there is no witness to the discharge except the member himself; and (4) the association shall not be liable, under the provisions of Sections 1, 2 and 3 of this article in excess of one tenth (1/10) of the amounts therein provided for benefits or indemnities for injuries or the results therefrom from any of the following circumstances, to wit: injuries intentionally inflicted upon the member by another person."

The cause was tried to a jury, and the court instructed that the evidence was without dispute that the insured "came to his death from a wound produced by the discharge of a bullet from a revolver, and that there was no eyewitness to the discharge of this revolver, except the deceased himself." The sole issue submitted was whether death was accidental or suicidal, and the jury found it to have been accidental, and returned a verdict against the defendant for $500, on which judgment was entered. The plaintiff appeals.—*Affirmed.*

*Jaques, Tisdale & Jaques,* for appellant.

*Sullivan & Sullivan* and *J. J. Smith,* for appellee.

LADD, J.—The decedent was a member of the defendant association, in good standing at the time of his death; and, unless this was suicidal or resulted from injuries intentionally inflicted "upon the member by another person," or from "injuries resulting from the discharge of firearms where there is no eyewitness to the discharge except the member himself," the plaintiff, as beneficiary, was entitled to recover an indemnity of $5,000. The issue as to whether death was the result of injuries intentionally inflicted was withdrawn, and the jury found death to have been accidental. One of the by-laws of the association limits the recovery to one tenth of the above indemnity in the event of death resulting "from the discharge of firearms where there is no witness to the discharge except the member himself." The court instructed the jury that there was no evidence that death resulted from injuries inflicted by another, and that it conclusively appeared that there was no eyewitness to the discharge of the pistol causing death. Appellant does not question

the first of these conclusions, but contends that the record was such as that the court should have submitted the issue as to there being an eyewitness to the jury. The burden so to prove was on the defendant. *Connell v. Iowa S. T. M. Assn.*, 139 Iowa 444; *Ellis v. Interstate Business Men's Acc. Assn.*, 183 Iowa 1279. In the morning of October 4, 1917, at about 6 o'clock, the insured was found·in that part of the cellar to his residence used as a laundry room in Ottumwa, with a ragged cut about one and one-half inches long, back of and a little above the right ear, and a bullet hole through the cut, a little back of the center of the head, and a bullet just beneath the skin on the opposite side. There were no external powder marks. These appeared internally. He was lying on his back, with his face up, with one foot on the second step of the stairway to the kitchen, and his head toward the door to the furnace room. His hands were over his chest, and, when his right hand was raised, a revolver dropped to the floor. It was what is known as a derringer revolver, with four barrels, two of which were emptied, and in which the bullet removed from the insured's head fitted. This kind of a weapon is fired by "drawing out this ring and then pulling it back. There is no stationary guard for the trigger on this gun. The guard and the trigger make a ring, and to cock it the ring is pushed as far as possible, and then, by pulling it back as far as possible, it shoots. It is a .32-caliber revolver."

The door from the kitchen to the cellarway leading to the laundry room was 2 feet 6 inches by 6 feet 6 inches high. It opens on a landing of the same width, 2 feet 8 inches, to the stairway, with 10 treads, with the floor as the eleventh. These treads are 10 inches wide, with the last one 10½ inches wide, and each rises 8½ inches. It is 30 inches wide, with a railing or bannister 2 inches wide on the right-hand side, opposite the wall. The kitchen floor is 7 feet 11 inches above the cement floor of the cellar, and the joists on which the floor rests are 2 by 8 inches. The stairway extends horizontally 7 feet 4 inches. The clearance of the stairway is 4 feet 8 inches, but on the sixth step from the floor, it is only 4 feet 2½ inches. From the lowest step to the door of the furnace room, the distance is 3½ feet. This door is of the same size as that from the kitchen, being to the left of the stairway, swinging to the south wall, and

when open, it is about 8 or 9 inches from the bottom step. This door was part way open, with a key in it, extending out 2 or 2½ inches, bent downward. The laundry room is 13 feet by 11 feet 11 inches, with one or two doors to the outside, and some windows. The furnace room is 5 feet in width, leading from the washroom, and has an outside door with glass in it. Two large pointer dogs were kept in the cellar, and were there when the body was found. They were shown to have habitually greeted their master and others with whom they were familiar by running against or playfully jumping upon them; but, when strangers were about, they would growl and bark. Though hunting dogs, they served also as watchdogs. When Pulos, who, with his wife, had rooms on the second floor, arose, at about 5 o'clock in the morning, he found the front door open 4 or 5 inches, and when decedent's wife, who slept on the second floor, came down stairs, 45 minutes later, the door was shut, but she observed her husband's grip on the dining room floor, and later his hat on the sleeping porch. Next to the kitchen to the east was a room called the den, where deceased kept his guns (10 or 12 of them) and other relics. None of the guns was loaded except the derringer revolver, which was kept in an old sideboard on the sleeping porch beyond the den. It is to be inferred that he procured the revolver from this room before entering the cellar stairway. He left the house at about 12 o'clock the night previous, to take a train to Guernsey, to attend to some business for his employer. His wife bade him good-by at the door, and watched him until out of sight. Shortly after 11 o'clock, he had telephoned friends about a proposed hunting trip. He loved to fish and hunt. His brother described him as "a very happy-go-lucky fellow. He didn't take anything very seriously. He did not worry. He had no financial or family troubles or anything of that kind that I know of." His wife testified that she "did not know of any financial trouble that Fritz had.

"He never had any trouble, because everybody liked him. I don't think Fritz had an enemy on earth. He was just as happy and jolly as he could be. Had no financial trouble. Had a bank account. * * * After supper, he went down town and got this check [for $10] cashed. He was gone about 10 minutes. He was at home all the rest of the evening. We had lunch about

11 o'clock. He called up Mr. Leeny before 12 o'clock,—before lunch. He left home after 12 o'clock. * * * He was a great lover of guns. He had all kinds.''

He had been successful in his employment in selling stoves for the Cole Manufacturing Company, and had arranged to go to Guernsey, to remedy defects alleged to exist in a stove disposed of some time previously. He had fallen down the cellar stairway several times, and had ''struck his head many times on the part of the floor'' in going down the steps. Neither his wife nor Mr. and Mrs. Pulos, who slept in the house, heard the discharge of a gun or any disturbance by the dogs. This evidence as to his sunny disposition and love of the out-of-doors was corroborated by others. He was 5 feet 6 or 8 inches high, weighed about 180 pounds, and everything about him indicated the love and enjoyment of life, rather than a tendency toward self-destruction. It should be added that the physician in attendance testified that:

''There were no powder marks or burns externally, but there were internally. To produce a wound of which all the powder marks were inside, the revolver would have to be held immediately in contact with the head. There were no powder marks on the outside. It did not make any difference about the powder marks being inside the head, whether the pistol was held against the head by direct pressure or whether it was jammed against the head.''

Some of the witnesses thought there were two cuts. The doctor was of opinion that death was instantaneous, and might have and probably did occur 3½ to 4 hours prior to the discovery of the body.

Such, in substance, is the evidence adduced, and we are asked whether it was such as to warrant the conclusion that there was no eyewitness to the discharge of the revolver, and if so, whether this conclusively appeared, or was an issue for the jury to pass on. What is meant by an eyewitness was well stated in *Ellis v. Interstate Bus. Men's Acc. Assn.*, 183 Iowa 1279, after reviewing *Roeh v. Business Men's Prot. Assn.*, 164 Iowa 199, and *Lewis v. Brotherhood Acc. Co.*, 194 Mass. 1:

''An eyewitness is a person who testifies to what he has seen. * * * Enough must be testified to by eyewitnesses to show the

operating cause of the injury, or at least to show that, at the time of the injury, there was an operating cause to which the accident may fairly be attributed, and to indicate in a general way the nature of that cause and the manner of its working. * * * In other words, if the eyewitnesses testify to personal observation of the 'operating cause,' it is not required that they shall have seen that cause in actual operation.''

This means that if, from observations made at the time, the operating cause is deducible, the witness making such observations is an eyewitness. Those observing the consequence only of the discharge of firearms are not eyewitnesses. This appears from *Roeh v. Business Men's Prot. Assn.*, 164 Iowa 199, where the court, speaking through Deemer, J., observed that:

''In the case at bar, the event,—that is to say, the accidental character of the discharge of firearms resulting in death,—must be established by at least one person other than the insured, and 'who was an eyewitness' does not necessarily mean that the witness should have seen the exact manner of the discharge; but it seems to us that it does comprehend the presence of the witness at or near the scene, and his direct observation of such facts and circumstances connected with the immediate transaction as, of themselves, and without any aid from presumption or inference arising from love of life or the instincts of self-preservation, indicate that the shooting was accidental.''

In *Lewis v. Brotherhood Acc. Co.*, 194 Mass. 1, it was said that:

''An eyewitness is a person who testifies to what he has seen. By the terms of this policy, the facts and circumstances of the accident and injury are to be established by those who saw them. Not only are the facts and circumstances of the injury to be established by an eyewitness, but also of the accident,—that is, the operating cause of the injury. Enough must be testified to by eyewitnesses to show the operating cause of the injury, or at least to show that, at the time of the injury, there was an operating cause to which the accident may fairly be attributed, and to indicate in a general way the nature of that cause and the manner of its working.''

The facts of this last case are fully stated in *Ellis v. Interstate Business Men's Acc. Assn.*, supra, and illustrate what is

intended by the term ''eyewitnesses'' when the particular operating cause is not observed, but enough is seen at the time to indicate an operating cause to which the injury or death may fairly be attributed. In *Lundberg v. Interstate Bus. Men's Acc. Assn.,* 162 Wis. 474 (156 N. W. 482), it appeared that the insured went to a little lake some miles from his home for the purpose of hunting and fishing; that, after eating dinner at a farmer's house, he went out on the lake, and was expected to return for supper. In the afternoon, about 5:30 o'clock, the housewife began operations for an evening meal, and went to the milkhouse on the lake shore, about 15 rods from the landing, and from there observed the deceased rowing towards the landing. While there, she heard the shot of a gun from the direction of the landing, and soon after, went there. She found the insured lying in the bottom of the boat, with his legs over the seat, and, on being called, he made no answer. Soon afterwards, her husband came to the place, and found the deceased lying in the boat, as stated. He had fallen over backward in the boat's seat, his rifle between his legs, the muzzle resting upon the front edge of the boat seat, pointing in the direction in which he had fallen, and the deceased had a bullet hole through his body, the bullet having entered the breast. In the boat were his fishing tackle and rod. No one saw him at the time the gun was discharged, or after he was seen rowing towards the landing, till the woman reached that point, after she had heard the shot. The rifle was found to have been discharged, the hammer in contact with the firing pin, and the shell in the chamber. The court held that there was no eyewitness, within the requirement of the policy, which stipulated that there should be no recovery for injuries caused by the discharge of the firearm unless the accidental discharge should be established by an eyewitness. Though there may have been no witness to the accidental discharge of the gun, there was to its discharge; for the farmer's wife saw enough at the time plainly to indicate the operating cause.

In *Becker v. Interstate Bus. Men's Acc. Assn.,* 265 Fed. 508, it appeared that, on May 10, 1917, at about 10:45 o'clock P. M., Mrs. Gladys Rummel and Miss Blanche Mustoe, then residing in Wichita, Kansas, and adjacent to the spot where deceased was found wounded, while preparing to retire for the

night, heard a shot, followed by the exclamation: "Don't shoot, Mister! Don't shoot!" The exclamation was followed by a shot similar to the first, and shortly afterwards, the insured was found near the sidewalk adjacent to the premises occupied by these women, disabled by a gunshot wound, from which death resulted. Neither of the witnesses saw anything, and neither could identify the voice. It was held that there was "no testimony by one who was an eyewitness: that is, by one who had an ocular view of any part of the casualty, or even of any circumstances immediately preceding or following it."

To be an eyewitness, one must have actually witnessed the discharge of the firearm, or the happenings and conditions at the time, from which such discharge is to be inferred. In the case at bar, the insured must have given up the trip, or have missed his train, and returned home at some time after midnight. Those sleeping in the house did not hear him return, nor any disturbance by the dogs, nor the discharge of the revolver. The outside door appears to have been out of repair, and was likely to spring open, unless fastened by the night latch, and it is likely that he omitted this, on entering. As the dogs continued in the cellar, it is to be inferred that the doors and windows thereof were closed. Though the presence of someone in the cellar was not negatived, the absence of trespassers is to be presumed, and especially after midnight. It may be that the dogs pounced upon him, when he undertook to go down the cellar stairway, or that he struck with his head the floor above, and fell, and in falling, reached the floor with the revolver in his right hand, as suggested by appellant; but all this is a matter of conjecture, and somewhat discredited by the circumstance that his right hand was over his breast, with the revolver in it. If he so fell that his head was cut by the key, was this before or after the discharge of the revolver? Had deceased entered the cellar armed, because of the growling and barking of the dogs, and to learn the cause? If so, were they disturbed by his entrance in the small hours of the night; or shall it be inferred that burglars had entered the inside, or trespassers were on the outside, and that the dogs were warning of their presence in the usual way? These are all matters of conjecture, and not to be inferred from the evidence. Presumably, only those in and about the premises

who had a right to be there were there, as none of those having a right to be there, or any other, witnessed anything immediately preceding, at the time of, or immediately subsequent to the discharge of the revolver; and there is no room for a finding other than that there was no eyewitness to the discharge of the revolver. Only the consequences thereof, unconnected with such discharge, were shown, and such evidence cannot be said to be that of an eyewitness. Our conclusion is that the deduction warranted by the record is that there was no eyewitness to the discharge of the revolver causing the death of the assured.— *Affirmed.*

WEAVER, C. J., STEVENS and ARTHUR, JJ., concur.